**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CASE NO: DLB-22-0159** |
| **DAVON HEMPHILL,** | |
| **Defendant.** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS TANGIBLE AND DERIVATIVE EVIDENCE

The United States of America respectfully submits this Response in Opposition to Defendant Davon Hemphill's Motion to Suppress Tangible and Derivative Evidence filed on November 14, 2022 (ECF No. 30). For the reasons that follow, this Court should summarily deny Defendant's Motion.

## BACKGROUND

### A. Factual Background

On January 1, 2022, Officer Daniel Vernes and Sergeant Tristan Ferguson of the Baltimore City Police Department ("BPD") were monitoring Closed-Circuit Television ("CCTV") Camera 2806 from the Western District Baltimore City Intelligence Center ("BCIC"). While monitoring CCTV Camera 2806. Both officers observed an individual wearing a white hoodie under a black bubble jacket in the block beginning at the intersection of Carey Street and Baltimore Street down to the intersection of Carey Street and Hollins Street, an area known to the BPD for its high level of illicit drug activity and violent crime. The officers also recognized that the individual was wearing clothing that was identical to clothing worn by a person of interest in a homicide that had occurred outside of the New York Fried Chicken restaurant located in the same area just a week

prior on December 25, 2021.[1]

Shortly after officers began observing that individual, he made two hand-to-hand exchanges (suspected drug transactions) with two unknown individuals a few minutes apart. *See* ECF No. 30, Exhibit 2 (Electronic Media File 3) at 8:15, 10:15. Although not noted in the Statement of Probable Cause, the Defendant can be seen on CCTV using his phone to shine a light on the items in his hand during each hand-to-hand transaction. *Id.* at 8:05, 10:05.[2]

Sergeant Ferguson relayed his observations and a description of the Defendant to other officers in the area to initiate a stop. Responding Officer Colton Holcomb and two additional officers walked north on Carey Street and observed an individual (later identified as Defendant Davon Hemphill upon arrest) walking toward them in a black bubble coat over a white hoodie. As they walked toward the Defendant, he fled on foot. As the officers pursued the Defendant, they observed him holding his front waistband area as if he were supporting the weight of an object, suspected to be a firearm.

After a short chase, the officers apprehended the Defendant on the corner of Carey Street and Hollins Street and placed him in handcuffs. Detective Arnold arrived moments later and conducted a pat down of the Defendant's jacket. Detective Arnold asked the Defendant if had a

---

[1] The individual officers observed on CCTV appears identical in clothing and appearance to the person of interest captured on in-store security cameras on the night of the homicide which occurred one week prior. *See* **Exhibit 1** (Screenshot from Store Security Camera Footage). The person of interest in that incident was captured on in-store CCTV footage handing a firearm over the counter to the store clerk of the aforementioned New York Fried Chicken location moments after the December 25th homicide was believed to have taken place.

[2] Prior to the first drug transaction, the glare of shiny lettering can be seen on the individual's white sweatshirt. *Id.* at 7:57. Following the two drug transactions, a large "K" can be seen on the individual's white hoodie as he continues to circle the block on the motorized scooter, *id.* at 21:23, 22:15, 22:53, 23:18, 25:45. In addition, clear shots of the Defendant's face are captured on the CCTV video, *id.* at 22:15, 22:53, making him easily identifiable as the individual that was captured on the Store Security Camera Footage a week prior.

weapon and the Defendant responded, "I got some weed and [inaudible]." ECF No. 30, Exhibit 2 (Electronic Media File 1) at 2:22. Detective Arnold then recovered a Bluetooth speaker and some duct tape from the Defendant's front hoodie pocket and a cellphone and multiple clear orange pill bottles of suspected controlled substances from the Defendant's outer jacket pocket. Detective Arnold stated, "he's got dope, weed…," and the Defendant interjected, "that's Molly." *Id.* at 2:55. Detective Arnold then sat the Defendant up and patted down his waistband area and felt another hard object. *Id*. at 3:36. Suspecting that the hard object was a firearm, Detective Arnold then asked the Defendant "what is this in your dip." *Id*. at 3:55. The Defendant responded "Listen to me, listen to me…the white boy….I'm trying to tell you the white boy had stole it. I took it from him just now." *Id*. at 4:25-4:50. Detective Arnold then searched the inside of the Defendant's waistband and recovered a Taurus G2C 9-millimeter handgun loaded with 7 rounds of 9-millimeter ammunition. *Id*. at 5:05.

The Defendant was Mirandized, *id*. at 6:50, and subsequently transported to the hospital upon request. Upon discharge from the hospital, Officer Holcomb found additional small containers of suspected controlled substances and additional cash in the Defendant's pants pockets.

In sum, officers recovered from the Defendant's person: a Taurus handgun loaded with 7 rounds of 9 millimeter ammunition; approximately 65 pills containing methamphetamine; one small vial containing cocaine; approximately 100 small flip-top containers with a suspected controlled substance; suspected marijuana in 8 orange pill bottles, 1 clear plastic bag, and 1 clear green flip-top container; approximately $2,843.30 in cash; and a cell phone.

## B. Indictment and Motion to Suppress Evidence

On April 26, 2022, a grand jury sitting in the District of Maryland charged the Defendant in a four-count Indictment with: one count of possession of a firearm and ammunition by a

prohibited person, in violation of 18 U.S.C. § 922(g); one count of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and one count of possession of a stolen firearm, in violation of 18 U.S.C. § 922(j). ECF No. 1.

On November 14, 2022, the Defendant filed a Motion seeking to suppress all tangible and derivative evidence recovered as a result of the above-described arrest. ECF No. 30. In his motion, the Defendant moves to suppress both the CCTV recordings and all of the evidence seized from the Defendant on the following bases: (1) the BPD's use of the CitiWatch Surveillance Program constitutes a dragnet search in violation of the Fourth Amendment, and (2) the BPD's arrest of the Defendant was not supported by probable cause and the post-arrest search was improper. *See* ECF No. 30 at 1. As explained below, both arguments are without merit.

## <u>ARGUMENT</u>

With respect to motions to suppress, the "burden of proof is on the party who seeks to suppress evidence." *United States v. Pollins*, 145 F. Supp. 3d 525, 538 (D. Md. 2015) (quoting *United States v. Bello-Murillo*, 62 F. Supp. 3d 488, 491–92 (E.D.V.A. 2014)). "Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence." *Id.* (internal citation omitted). For the reasons that follow, both of the Defendant's arguments fail.

First, the United States Supreme Court has consistently held that the Fourth Amendment does not protect what one decides to knowingly expose to the public, including public movements on public streets. In this case, the Defendant was observed by officers riding a scooter and selling drugs on a public city block by a conspicuously placed CCTV camera. Because he had no expectation of privacy in his movements on the street, the officers' observations did not constitute

a search. And while the Defendant's Motion to Suppress discusses the CitiWatch program at large, arguing that all of the CCTV cameras in the city—taken together—allow BPD to access data akin to a "dragnet" Fourth Amendment search, that is not the issue before this Court. The Defendant has moved to suppress, and only has standing to move to suppress, the firearm, ammunition, and controlled substances recovered from his person after he was stopped based on the officers' observations via CCTV Camera 2806 on the date of January 1, 2022, and the use of that camera to surveil what the Defendant knowingly exposed to the public did not constitute a Fourth Amendment search.

Second, the officers had probable cause to arrest the defendant after, in a high crime area, he was observed by officers—via CCTV 2806—conducting two hand-to-hand drug transactions and, in addition, fled the moment he saw officers enter the area.

Accordingly, the Defendant's Motion to Suppress should be denied.

## I. BPD'S OBSERVATIONS OF THE DEFENDANT VIA CITIWATCH CCTV CAMERA 2806 WERE CONSTITUTIONAL.

### A. Baltimore's CitiWatch Program

Baltimore first placed CCTV cameras throughout the city in 2005, when former Baltimore Mayor Martin O'Malley launched Baltimore's CitiWatch program. Today, these fixed-position cameras are strategically placed in locations throughout Baltimore City. *See* **Exhibit 2**, Baltimore City Police Department ("BPD") Policy 1014, Video Surveillance Procedures, at 1. The purpose of the CCTV cameras is to, among other things, deter crime and aid in apprehending suspects by allowing CCTV personnel[3] to monitor and/or capture real-time footage. *Id*. In addition to being

---

[3] CCTV personnel include personnel at Baltimore City Intelligence Centers located in various districts (including officers with the Baltimore City Police Department), CitiWatch, Watch Center and/or the Homeland Security Division. Since the relevant personnel here are officers with the BPD, the Government will only refer to the BPD as watching the CCTV cameras.

fixed-position cameras, these cameras are conspicuously placed on buildings, lamp posts, and standalone poles. While the BPD can view several cameras at once, an officer can only control one camera at a time. While in control of the camera, an officer can remotely zoom, pan, and tilt the camera. The default, however, is that the cameras continually spin. The cameras also cannot capture audio.

Footage recorded by CCTV cameras is stored for up to 28 days. *Id*. at 1. Under BPD Policy, if either an arrest is made utilizing CCTV or, after an arrest, the BPD believes that CCTV cameras are located in the area, then the BPD must ensure that a video retrieval request is completed. *Id.* at 1-2. The BPD may also review footage of an incident potentially captured by a CCTV camera by submitting the video retrieval request form. *Id.* at 2-3. Once retrieved, the footage is to be retained throughout an arrestee's sentence. *Id.* at 4.

The CitiWatch program, which is a public-private partnership, formed as private citizens in Southeast Baltimore were organizing to implement a similar system of their own: "Over the summer, residents in Butchers Hill, fed up with break-ins and robberies, talked about creating a database of homes with security cameras that detectives in the Police Department's Southeastern District could access to help solve property and street crimes. Butchers Hill Association President Beth Manning said the new [CitiWatch] partnership appears to be what residents had in mind." *See* Broadwater and George, *City expands surveillance system to include private camera of residents, businesses*.

Business leaders included the CitiWatch program among their options to keep employees safe, reduce commercial vacancy rates, decrease the need for private security, and preserve the

viability of downtown Baltimore. *See* Melody Simmons, *Dozens of Baltimore's top CEOs, developers convene to talk downtown crime*, Baltimore Business Journal (August 16, 2021).[4] And, according to one community representative, a number of businesses in the Inner Harbor have installed private cameras and are participating in the CitiWatch program on their own. *See* Jonathan Munshaw, *3 ways Baltimore businesses can help assist the city in the crime fight*, Baltimore Business Journal (November 8, 2017).[5]

Even along Pennsylvania Avenue in West Baltimore, which had "declined into one of the city's more notorious open-air drug markets, where dealers sold heroin out of stores and held businesses hostage," community members are hopeful that "the main business strip can return to its heyday if shoppers and business owners feel safe." *See* Broadwater and George, *City expands surveillance system to include private camera of residents, businesses*. "The CitiWatch partnership," one small business owner said, "is a good step toward that end." *Id.*

Baltimore institutions have also invested in the CitiWatch program. In 2015, for example, Johns Hopkins University invested funds to add CCTV cameras along North Charles Street between North Avenue and 28th Street, citing the need to support "the health of the communities around it." Michael Olesker, *Johns Hopkins and its neighbors launch public safety effort*, Johns Hopkins University Gazette (January/February 2015).[6] Community leaders welcomed the

---

[4] *See* Westlaw at 2021 WLNR 26704605.

[5] *See* https://www.bizjournals.com/baltimore/news/2017/11/08/3-ways-baltimore-businesses-can-help-assist-the.html (last accessed December 5, 2022).

[6] *See* https://hub.jhu.edu/gazette/2015/january-february/currents-hcpi-public-safety/ (last accessed December 5, 2022).

investment, saying "[w]e've got a great opportunity here to re-energize the area," and that "[w]e're building a lot of momentum . . . but so much of it depends on people's sense of security." *Id.*

Where there are gaps in CitiWatch coverage, some communities have taken the initiative to band together and create their own private networks. Some communities have done so with direct consultation with the BPD. Others have done so to develop evidence when they report crimes. Religious leaders in Northwest Baltimore, for example, secured funding in 2019 to build a network of private surveillance cameras, in partnership with the BPD, to "aid police in fighting crime without exposing residents to retaliatory violence." Kevin Rector, *'Virtual neighborhood watch': Baltimore faith group building surveillance network with help from Amazon Ring*, Baltimore Sun (August 21, 2019).[7] As one religious leader put it, "Hopefully with the presence of more cameras, that will just be a deterrent right there, and people will be less inclined to come and do nefarious things in the community, because they will know the community is on guard." *Id.* Another religious leader who supported the program noted that "senior citizens and kids are trapped in their homes for fear of violence on the streets." *Id.* "This is people who are sick and tired of being locked in their homes, fearful of the activity that is going on on the corner, and doing what is needed to protect and be more vigilant without fear of being seen as someone who is 'snitching.'" *Id.*

---

[7] *See* https://www.baltimoresun.com/news/crime/bs-md-ci-cr-baltimore-ring-surveillance-network-20190821-nhr4ywxdmbagjle73t7cca2uqa-story.html (last accessed December 5, 2022).

Local media has also reported that the CitiWatch program is "vital" to Baltimore's public safety efforts. *See* Kai Reed, *CitiWatch cameras vital in Baltimore crime prevention*, WBAL-TV 11 (January 18, 2018).[8]

### B. The Defendant Only Has Standing to Challenge the Use of Camera 2806 on January 1, 2022.

Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure allows a defendant to file a pretrial motion to suppress evidence. Under Rule 12(b)(4), the Government may notify the defendant of its intent to use specified evidence, or a defendant may request that the Government do so, so that the defendant can identify any such evidence that would be the subject of a pretrial motion to suppress. Once the evidence is identified, "[s]uppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *United States v. Castellanos*, 716 F.3d 828, 833 (4th Cir. 2013) (citation omitted).

The CitiWatch CCTV evidence pertaining to the instant Defendant is limited to footage from CCTV Camera 2806 on January 1, 2022. The Government did not produce any footage from other CCTV cameras on that date. Accordingly, the Defendant's standing is limited to challenging the use of CCTV Camera 2806 on January 1, 2022. The Defendant does not have standing to challenge the *entire system* of CitiWatch cameras. The alleged practices that he claims make the CCTV system problematic as a whole do not apply to Camera 2806. That single CCTV camera does not amount to surveillance that is "ever-present" and "everywhere." ECF No. 30 at 8. Police did not watch him leave his house and then observe intimate and all-encompassing details of his

---

[8] *See* https://www.wbaltv.com/article/citiwatch-cameras-vital-in-baltimore-crime-prevention/15374411# (last accessed December 5, 2022).

daily life. They did not surveil him from block to block. They did not use retrospective location information or previously retained CCTV footage. They did not move backward in time and retrace his steps, day-by-day, for any period of time, let alone a lengthy one. They did not use the camera in any unconstitutional way that day. The Defendant simply cannot assert a broad constitutional violation on behalf of the public that did not happen to him individually. Rather, the issue before this Court is limited to whether BPD's surveillance of the Defendant via CCTV Camera 2806 on January 1, 2022 violated his reasonable expectation of privacy.

### C. The Use of Camera 2806 on January 1, 2022, Did Not Constitute a Fourth Amendment Search of the Defendant.

#### i. Observations on a Public Street, By Traditional Surveillance Techniques, Are Not a Fourth Amendment Search.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The touchstone of the Fourth Amendment analysis is "reasonableness," which requires a balance "between the public interest and the individual's right to personal security free from arbitrary interference by law enforcement officers." *United States v. Watson*, 703 F.3d 684, 690 (4th Cir. 2013) (quoting *United States v. Stanfield*, 109 F.3d 976, 979 (4th Cir. 1997)). Relevant here, a search is unreasonable if a government actor violates a person's "reasonable expectation of privacy." *United States v. Jones*, 565 U.S. 400, 406 (2012). The reasonable expectation of privacy test asks: (1) whether "an individual 'seeks to preserve something as private'"; and (2) whether that expectation "is 'one that society is prepared to recognize as reasonable." *Carpenter v. United States*, 138 S.Ct. 2206, 2213 (2018) (citation omitted).

The Supreme Court has consistently held that "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." *Katz v. United States*, 389 U.S. 347,

351 (1967). This is because by performing an act in public, an individual "voluntarily convey[s] to anyone who want[s] to look the fact that he [i]s traveling over particular roads in a particular direction, the fact of whatever stops he ma[kes], and the fact of his final destination when he exit[s] from public roads onto private property." *United States v. Knotts*, 460 U.S. 276 (1983).

The Supreme Court has applied this principle to law enforcement's use of cameras to aid investigations, holding that the taking of photographs from navigable airspace does not violate the Fourth Amendment because "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed." *California v. Ciraolo*, 476 U.S 207 (1986); *see also Dow Chemical Co. v. United States*, 476 U.S. 227 (1986) ("[T]he taking of aerial photographs of [a 2,000 acre] industrial plant complex from navigable airspace is not a search prohibited by the Fourth Amendment."). In *United States v. Knotts*, the Court also applied this principle when holding that the use of an electronic beeper on a vehicle to assist tracking the vehicle through public streets with visual surveillance was not a Fourth Amendment search. 460 U.S. 276 (1983).

Notably, even in cases where the Supreme Court and Fourth Circuit have held that certain surveillance constitutes a Fourth Amendment search, the courts have explicitly distinguished and affirmed the use of standard surveillance techniques such as public surveillance cameras. *See Carpenter v. United States*, 138 S.Ct. 2206, 2220 (2018) ("We do not . . . call into question conventional surveillance techniques and tools, such as security cameras."); *see also Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330, 345 (4th Cir. 2021) ("People understand that they may be filmed by security cameras on city streets, or a police officer could stake out their house and tail them for a time."); *Kyllo v. United States*, 533 U.S. 27 (2001) (holding that the warrantless use of a thermal imaging device—"police technology" that was "not in general

public use"—that could detect heat patterns inside a home discovered details about the contents of the home that could not otherwise be obtained without physical intrusion, and therefore constituted an unlawful search).

Moreover, the United States Courts of Appeals for several circuits, including the Fourth Circuit, have held that what one voluntarily exposes to the public has no Fourth Amendment protection even when the individual does not know that they are being surveilled. In *United States v. Vankesteren*, the Fourth Circuit held that the government did not violate the Fourth Amendment when it placed a hidden, fixed-range, motion-activated video camera in the defendant's open fields. 553 F.3d 286 (4th Cir. 2009). These fields, while owned by the defendant, were located a mile or more from his home, near a public road, and accessible to other members of the public. *Id.* at 290-91. Accordingly, because law enforcement would have been "free, as on public land, to use video surveillance to capture what any passerby would have been able to observe," the defendant had no legitimate expectation of privacy and the cameras did not constitute a search. *Id.* at 291. "That the agents chose to use a more resource-efficient surveillance method" did not change the court's analysis. *Id.*

The Sixth, Seventh, and Tenth Circuits have similarly held that, even when the secret surveillance is capturing live and historical recordings of the outside of an individual's home, accessing the surveillance does not constitute a Fourth Amendment search. *United States v. Houston*, 813 F.3d 282 (6th Cir. 2016) (upheld warrantless use of pole camera aimed towards defendant's home for ten weeks); *United States v. Tuggle*, 4 F.4th 505 (7th Cir. 2021) (upheld warrantless use of three pole cameras trained on defendant's house for eighteen months); *United States v. Jackson*, 213 F.3d 1269 (10th Cir.), *vacated on other grounds*, 531 U.S. 1033 (2000) (upheld warrantless use of video cameras installed on telephone poles overlooking the defendants'

houses). *But see United States v. Moore-Bush*, 36 F.4th 320, 321 (1st Cir. 2022) (concluding that "the government did conduct a Fourth Amendment 'search' when it accessed the digital video record that law enforcement had created over the course of the eight months in question, notwithstanding the government's contention that the record itself is merely a compendium of images of what had been exposed to public view.")

      **ii.**    **CCTV Camera 2806 Only Captured What the Defendant Knowingly Exposed to the Public and Did Not Involve "Highly Sophisticated Surveillance."**

Under the Supreme Court and Fourth Circuit precedent—and consistent with the Maryland District Court's recent rulings in *United States v. Branch,* Crim. No., CCB-21-0145 (D. Md. 2022) and *United States v. Mayes*, Crim No. DKC-20-0177 (D. Md. 2022)—the use of CCTV Camera 2806 to capture what the Defendant knowingly exposed to the public did not constitute a Fourth Amendment search.

First, Officer Vernes and Sergeant Ferguson only observed via CCTV Camera 2806 what they could have observed if they had been surveilling the Block of Carey Street between Baltimore Street and Hollins Street in person. CCTV cameras, when being physically manipulated by a BPD officer, can only be controlled in a limited fashion, by zooming, panning, and tilting. *See generally* ECF No. 30, Exhibit 2 (Electronic Media File 3). Accordingly, the cameras are akin to what an officer could observe on the street with or without the assistance of visual aids such as binoculars or handheld cameras. CCTV cameras do not capture anything happening inside of buildings or homes that is not otherwise exposed to the public. Accordingly, CCTV cameras do not travel inside homes or any other constitutionally protected area. Since it would have been constitutionally permissible for BPD officers to surveil the Defendant on foot or in a car in the manner that CCTV

Camera 2806 observed the Defendant on January 1, 2022, the use of CCTV Camera 2806 to do the same was also constitutionally permissible.

Notably, CCTV Camera 2806—and all of the CCTV cameras—is also *obvious*. CCTV cameras are surveillance cameras that every individual who walks the streets of Baltimore can identify and, when they do, any expectation of privacy that they may have otherwise had in their public movements (if any) vanishes. Anyone can also look up online exactly where the CCTV cameras are located. *See* Open Baltimore,  https://data.baltimorecity.gov/datasets/baltimore::cctv-locations-crime-cameras/explore?location=39.300281%2C-76.584682%2C11.50  (last accessed December 5, 2022). Accordingly, CCTV Camera 2806 only captured what the Defendant knowingly and voluntarily decided to expose to the public on January 1, 2022. As noted above, *Ciralo*, *Dow Chemical*, and the Courts of Appeals opinions regarding pole cameras are all consistent with the general principle that a person does not have a reasonable expectation of privacy in their public movements.

Second, CCTV Camera 2806—and all of the CCTV cameras—is not the "highly sophisticated surveillance" that the Court warned of in *Dow Chemical*, nor is it a device that is "not in general public use," as distinguished from the thermal imaging devices that were employed in *Kyllo*. *See Dow Chemical,* 476 U.S. at 1827 (warning that "surveillance of private property by using highly sophisticated surveillance equipment not generally available to the public" might run afoul of the Fourth Amendment, but distinguishing the photographs taken from the plans in that case that were "not so revealing of intimate details as to raise constitutional concerns"); *see also Kyllo,* 533 U.S. at 40 (holding that the thermal imaging devices—which was not in "general public use" and explored details that "would previously have been unknowable without physical intrusion" constituted a Fourth Amendment search).

The CitiWatch CCTV cameras are also unlike the AIR technology that was at issue in *Leaders of a Beautiful Struggle*, and they do not create the detailed, encyclopedic CSLI data that was at issue in *Carpenter*. Rather, surveillance cameras like CCTV Camera 2806 have long been available for commercial and law enforcement use. CCTV cameras, in general, are conventional technology, that have an ever-growing common place role in our society. Accordingly, CCTV Camera 2806 is the exact kind of "conventional surveillance technique[]" that the Court carefully said it was *not* calling into question in *Carpenter* and that the Fourth Circuit intentionally distinguished from the AIR program in *Leaders of a Beautiful Struggle*.

**D. Even if the Defendant Has Standing to Challenge the BPD's Observations Via the Entire System of CitiWatch CCTV Cameras, They Are Constitutional**.

Even if the Defendant had standing to challenge the entire system of CitiWatch CCTV cameras, which he does not, the CitiWatch system is a far cry from the efficient, detailed chronicle of historical location information that law enforcement accessed in *Carpenter* and *Leaders of a Beautiful Struggle*. The CCTV camera system merely allows officers to access—by viewing in real time or by viewing within 28 days of being captured—footage from individual CCTV cameras. The CCTV cameras do not amount to "nearly comprehensive surveillance" of the streets of Baltimore City.

In *Carpenter*, the Supreme Court considered, in contrast to traditional surveillance techniques like cameras, "a new phenomenon: the ability to chronicle a person's past movements through the record of [their] cell phone signals." 138 S.Ct. at 2216. Ultimately, a divided Court held that the government's warrantless accessing of cell site location information ("CSLI"), which consisted of a "deep repository of historical location information," specifically 12,898 location points for the defendant, averaging 101 data points per day, violated the Fourth Amendment. *Id.* at 2212, 2218. In reaching this decision, the Court emphasized that the information provided

through the CSLI data was "detailed, encyclopedic, and effortlessly compiled." *Id.* at 2216. It could provide a "detailed chronicle of a person's physical presence compiled every day, every moment, over several years," which "achieve[d] near perfect surveillance"—chronicling not only "particular movements, but through them [an individual's] 'familiar, political, professional, religious, and sexual associations.'" *Id.* at 2217-18, 2220 (quoting *United States v. Jones*, 565 U.S. 400, 415 (2012)) (Sotomayor, J., concurring). The Court also considered CSLI's retrospective quality; that up to five years after an incident (at that time, the Court noted that wireless carriers maintain records for up to five years), law enforcement could warrantlessly retrace a person's movements surrounding that incident. *Id.* at 2218.

All of these factors, together, led the majority to conclude that "an individual maintains a legitimate expectation of privacy in the record of his physical movements *as captured through CSLI.*" *Carpenter*, 138 S.Ct. at 2217 (emphasis added). Accordingly, "when the government accessed the CSLI data from the wireless carriers"—when the government received a detailed list of CSLI data showing where an individual had traveled over the request time period—"it violated Carpenter's reasonable expectation of privacy in the whole of his physical movements." *Id.* at 2219. However, the *Carpenter* Court specifically held that its decision was a "narrow one." *Id.* at 2220. In fact, it specifically noted that it was *not* disturbing its prior jurisprudence as to "conventional surveillance techniques and tools, *such as security cameras.*" *Id.* (emphasis added).

In *Leaders of a Beautiful Struggle*, the Fourth Circuit again affirmed the use of standard surveillance cameras but distinguished the technology at issue. 2 F.4th at 345. Specifically, the court held that the warrantless use of an aerial investigation research ("AIR") program, which used first of its kind planes equipped with high-tech cameras, captured roughly 32 square miles per image per second, and obtained an estimated twelve hours of coverage of around 90% of the city

every day, violated the Fourth Amendment. 2 F.4th at 334, 345. While the program limited its data collection to daylight hours and the photographic resolution to one pixel per person or vehicle, reducing an individual or a vehicle to a blurred dot, it "enable[d] photographic, retrospective location tracking in multi-hour blocks, often over consecutive days, with a month and a half of daytimes for analysts to work with." *Id.* at 342. Although there were gaps in the data, the program "surpass[ed] the precision of even GPS data and CSLI." *Id.* at 343. AIR data could allow investigators to track a person's movements from a crime scene to their residence, and then by "look[ing] through time," allow them to track movements from that residence. *Id.* For example, during its pilot run, one AIR investigation "monitor[ed] the home of a suspect's mother over the course of two days and track[ed] the individuals who came and went," and "detail[ed] a vehicle's movements over the course of three days, listing eleven locations at which the vehicle stopped, and noting the interactions the driver had with other individuals." *Id.* at 343, FN 9.

Given the AIR program's capabilities, the Fourth Circuit held that the warrantless accessing of the AIR program's data violated the Fourth Amendment because it recorded the movements of a city and, with analysis, it could reveal where individuals travel over an extended period of time. *Leaders of a Beautiful Struggle*, 2 F.4th at 346. Like in *Carpenter*, the Fourth Circuit specifically contrasted the AIR program from "short term" surveillance, or surveillance that merely augments ordinary police capabilities. *Id.* at 345. It also specifically contrasted people's understanding "that they may be filmed by security cameras on city streets, or a police officer could stake out their house and tail them for a time." *Id.* "Capturing everyone's movements outside during the daytime for 45 days," as the AIR program did, went "beyond that ordinary capacity" and therefore warrantless accessing of such data violated the Fourth Amendment.

Both the Supreme Court in *Carpenter* and the Fourth Circuit in *Leaders of a Beautiful Struggle* held that when law enforcement accessed the CSLI data and AIR data, respectively, law enforcement conducted a search that was governed by the Fourth Amendment. But the technologies at issue in those cases aggregated data that was not in any meaningful sense "knowingly exposed" by the target, like here. Specifically, when law enforcement accessed the CSLI data, they had a retrospective map of an individual's movements for the requested, long-term time period. When law enforcement accessed the AIR data, they had a map of all public movements in a city during the daytime for 45 days. Here, whether officers are using CCTV cameras to conduct proactive investigation or to investigate crimes that have already occurred, they merely access footage from individual CCTV cameras setup throughout the city.

To be sure, the Government does not contest that, after a crime like a shooting or homicide, the BPD will do their best to use CCTV cameras to track suspects that were near a crime before, during or after. The BPD will also use CCTV, in conjunction with other investigative techniques, to surveil areas officers know are plagued by violence to learn more about the individuals in the area and identify suspects of violent crimes and the specific areas or buildings they frequent. To this extent, law enforcement officers attempt to use footage from CCTV cameras retrospectively. However, the suggestion by the Defendant that BPD can use CCTV cameras to track individuals to the degree contemplated in *Carpenter* and *Leaders of a Beautiful Struggle* is simply inconsistent with the technology of the CitiWatch CCTV system. Moreover, such an assertion is refuted by the overall crime rate in Baltimore, which has continued to soar despite the implementation and growth of CCTV cameras since 2005.

The Defendant's Motion to Suppress characterizes the CitiWatch CCTV cameras as "ever-present" and "everywhere," implying that such devices saturate the city with 24-hour surveillance.

Yet, the CCTV cameras are far from an "ever-present" comprehensive surveillance system. First, although there are numerous CCTV cameras throughout the city, and in some violent parts of the city cameras nearly block by block, they are not, in fact, on every block. While certainly prevalent, the CCTV cameras do not constantly monitor the entire city, as the AIR program did (capturing 90% of the city during daylight hours), nor provide the same capacity of data that CSLI information could reveal.

Second, even where CCTV cameras are extremely prevalent, their footage is still limited. When not controlled by law enforcement, the cameras randomly pan in circles. This clearly leaves a majority of the area that is sought to be covered by a particular camera un-monitored for several moments at a time. When investigators attempt to use CCTV to investigate past crimes, they are limited by this function of the CCTV cameras. Moreover, while unmanned and spinning, the cameras will not have zoomed in on any particular person or vehicle and will not have followed any individual person or vehicle. If, by chance, an officer identifies a suspect that has committed a crime, there is a small chance that the officer would be able to observe the suspect as he traveled away from the scene of the crime (especially considering that the suspect would likely be fleeing quickly on foot or in a car) under these conditions. Rather, the best evidence the officer will receive is the surveillance video from the incident itself. This is in stark contrast to the comprehensive data that was at issue in *Carpenter* or *Leaders of a Beautiful Struggle.*

CitiWatch's retention policy is also a significant factor that distinguishes the CCTV program from the technologies at issue in *Carpenter* and *Leaders of a Beautiful Struggle*. CitiWatch CCTV footage, if not retained, is only available for 28 days. The preservation of CCTV footage beyond that period is, therefore, targeted. When a crime occurs, officers only retain the CCTV footage that did or may have captured events relevant to an arrest or incident. This short

time period of 28 days, the manpower it takes to parse through CCTV footage, and all of the physical limitations of the system described above, significantly differentiate accessing CCTV footage from accessing CSLI data or the data obtained from the AIR program. Rather, the well-established principle that what one voluntarily exposes to the public has no Fourth Amendment protection controls here.

### E. Recent Decisions from the District of Maryland Support Denial of the Defendant's Motion to Suppress.

At least two Courts in the District of Maryland recently considered—and rejected—nearly-identical Fourth Amendment challenges to Baltimore's CitiWatch program. *See* **Exhibit 3***, United States v. Branch*, Crim. No. CCB-21-0145, Trans. from Feb. 10, 2022 Motions Hearing, at pp. 89-92; **Exhibit 4**, *United States v. Mayes*, Crim No. DKC-20-0177, Trans. from Apr. 8, 2022 Motions Hearing, at pp. 5-6. In *Branch*, the Honorable Judge Blake rejected the argument that Baltimore's CitiWatch program is akin to the surveillance systems in *Carpenter* and *Leaders of a Beautiful Struggle*. *See* Ex. 2 at 91. In upholding the constitutionality of CitiWatch, Judge Blake noted that the *Carpenter* Court distinguished CSLI from traditional surveillance methods like security cameras. *Id.* at 90. Likewise, the Court found that in *Leaders of a Beautiful Struggle,* the Fourth Circuit distinguished the aerial surveillance system from security cameras on city streets. *Id.* at 91. Judge Blake also noted that CitiWatch cameras are conspicuous, serve a community caretaking purpose, and are more similar to the pole camera in *Vankesteren*. *Id.* Ultimately, the Court upheld the constitutionality of CitiWatch and concluded as follows:

> Given the distinctions between the surveillance systems in *Carpenter* to the surveillance systems in *Beautiful Struggle* and the surveillance systems at issue here, and given the fairly clear dicta in *Carpenter* and *Beautiful Struggle* distinguishing conventional surveillance tools like security cameras, I would deny the Motion to Suppress insofar as it relies on the unconstitutionality of the CitiWatch system.

*Id*. In *Mayes*, the Honorable Judge Chasanow adopted Judge Blake's conclusion, finding that "nothing in *Carpenter* or *Beautiful Struggle* seriously called into question the use of the CitiWatch camera program." *See* Ex. 4 at 6.

This Court should find the same. CitiWatch CCTV Camera 2806 is a traditional surveillance tool that captured what the Defendant knowingly exposed to the public on the night of January 1, 2022. Thus, the use of it by officers to observe the Defendant did not amount to a Fourth Amendment search. Accordingly, the Defendant's Motion to Suppress should be denied.

## II. BPD OFFICERS HAD PROBABLE CAUSE TO ARREST THE DEFENDANT

### A. Legal Standard

An officer may conduct an investigatory stop of an individual if the officer, with their practical experience, determines there is reasonable suspicion based on articulable facts that criminal activity is afoot. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also Terry v. Ohio*, 392 U.S. 1, 21 (1968) (explaining that to stop and briefly detain an individual for investigative purposes, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion"). This is a less demanding standard than probable cause, and even "requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Rather, the officer must be able "to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Id.* (quoting *Terry*, 392 U.S. at 27). The investigatory stop may involve a brief, complete restriction of liberty. *United States v. Elston*, 479 F.3d 314, 319 (4th Cir. 2007) (internal quotations omitted).

An officer may then make a warrantless arrest if there is probable cause to believe a felony is being or has been committed. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). Probable cause

exists when the facts and circumstances known to the officer "would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Garcia*, 848 F.2d 58, 59–60 (4th Cir. 1988) (internal quotations omitted). In assessing the existence of probable cause, courts examine the totality of the circumstances known to the officer at the time of the arrest. *United States v. Al–Talib*, 55 F.3d 923, 931 (4th Cir. 1995) (*citing Gates*, 462 U.S. at 230–31. Although probable cause must be supported by more than a mere suspicion, evidence sufficient to convict is not required. *Wong Sun v. United States*, 371 U.S. 471, 479 (1963).

### B. Officers Had Probable Cause to Arrest the Defendant

The Defendant's arrest was supported by probable cause. Maryland law prohibits both the distribution of controlled dangerous substances and possession with the intent to distribute controlled dangerous substances. *See* Md. Code, Crim. Law § 5-602. The Government anticipates that Officer Vernes and Sergeant Ferguson will testify that, based on the totality of the circumstances, they believed that the Defendant was both distributing controlled dangerous substances and that he possessed those controlled dangerous substances with the intent to distribute them.

Officer Vernes and Sergeant Ferguson observed the Defendant at approximately 7:50 p.m. in an area known for drug sales. At that time, the Defendant was observed circling the block on a motorized scooter and riding up to multiple individuals who were walking through the area. Shortly thereafter, at approximately 7:52 p.m., the Defendant drove his scooter up to an individual on the block, got off the scooter, and began having a conversation. At approximately 7:53 p.m., the Defendant turned on his cell phone flashlight and showed that individual items in his open hand. *See* Exhibit 5 (Screenshot 1 from CCTV Camera 2806). The Defendant then placed the items in the individual's hand. The individual subsequently placed the items in his jacket and walked

away from the area. Less than two minutes later, at approximately 7:54 p.m., the Defendant drove his scooter up to a different individual and conducted a similar transaction—that is, the Defendant approached an individual, had a brief conversation with that individual, removed some items form his jacket pocket and placed them under the light emanating from the scooter, *see* Exhibit 6 (Screenshot 2 from CCTV Camera 2806), and then handed those items to the individual who subsequently walked back in the same direction from which he came. Although the actual items being exchanged in each transaction were not clearly visible to the officers observing the Defendant through the CCTV camera, the officers nevertheless had probable cause to believe that the Defendant was actively drug dealing in the block and had illegal drugs on his person based on the totality of the circumstances.

Alternatively—and at a minimum—the officers had reasonable suspicion to conduct an investigatory stop and to frisk the Defendant. The fact that the Defendant was handcuffed during that stop did not transform it into an arrest. As the Fourth Circuit recently confirmed in *United States v. Ruffin*:

> It is well established in this circuit that "handcuffing a suspect . . . does not necessarily elevate a lawful [*Terry*] stop into a custodial arrest." *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007) (internal quotation marks omitted). This is because "[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989). In particular, the reasonableness of handcuffing a suspect during a *Terry* stop depends on whether doing so is "necessary to maintain the status quo and protect [officer] safety." *Ibid.* (internal quotation marks omitted).

814 F. App'x 741, 749 (4th Cir. 2020). Here, briefly handcuffing the Defendant was necessary for the officers' safety, particularly given the Defendant's initial resistance to the responding officers' commands to stop and his subsequent attempt to flee. Officers also observed the Defendant reach and hold an object from outside of his clothing "that appeared to be weighing down his pants [. .

.]," indicating that he could be armed. *See* ECF No. 30, Exhibit 1 (Statement of Probable Cause). Moreover, once the responding officers discovered the pill bottle of suspected CDS in the Defendant's jacket pocket and the Defendant admitted to having marijuana and "Molly" on his person, the officers had more than enough probable cause to arrest the Defendant. Therefore, the Defendant's Motion to Suppress should be denied.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that the Court deny the Defendant's Motion to Suppress Tangible and Derivative Evidence.

Respectfully submitted,

Erek L. Barron,
United States Attorney

By: _____/s/_____

Jonathan S. Tsuei
Special Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201
Phone: (410) 209-4800